THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK PRINCE, Defendant-Appellant.

First District (5th Division)   No. 1—95—1549

Opinion filed May 2, 1997.

Rita A. Fry, Public Defender, of Chicago (Lisa Ottenfeld, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Susan R. Schierl, and John Robert Blakey, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant appeals his conviction for attempted armed robbery and first-degree murder in a bench trial, raising as issues whether (1) his motions to quash his arrest and suppress his confession were erroneously denied; (2) the *corpus delicti* of his attempted armed robbery was proved beyond a reasonable doubt; (3) his conviction of attempted armed robbery was a lesser included offense of felony murder; and (4) the 60-year sentence for the murder conviction imposed upon him was excessive.

On August 28, 1991, Edward Porter was shot and killed as he stood on the sidewalk at 2858 West Flournoy, near Francisco. A few weeks later, an anonymous telephone call to police offered details of the crime and claimed that defendant, then 19 years old, shot and killed Porter. On October 6, defendant confessed to the crime and signed a written statement for police, who then formally placed him under arrest. A grand jury indicted defendant and another man, Jeffrey Williams, charging them with four counts of first-degree murder, one count of armed violence, one count of attempted armed robbery, and one count of aggravated unlawful restraint. Defendant also was charged with unlawful use of a firearm by a felon.

Defendant moved to quash his arrest and suppress his statement, arguing that the State lacked probable cause to arrest him and that any evidence obtained after that arrest was inadmissible. In an amended motion to suppress the statement, defendant asserted that police abused him, forced him to sign the statement, and misrepresented to him that he was identified in a lineup.

At the hearing on the motion to quash his arrest, defendant testified that on the evening of October 6, while he was asleep at his girlfriend's home, Detective Kriston Kato[1] entered the bedroom with his gun drawn, ordered him to get up, handcuffed him, and took him to the police station without allowing him to get dressed. Defendant was placed in an interrogation room, his left hand was handcuffed to the wall, and he was not allowed to use the bathroom or obtain water from a fountain.

Countervailing testimony of four police officers included that of Detective Dennis Keane, who stated that he and his partner investigated the August 28 shooting and learned that Juanita Reed, who lived at the corner of Flournoy and Francisco, had been sitting in a chair in the back yard of her home, saw the victim park a car

---

[1]Various portions of the record refer to the detective as either "Kato" or "Cato."

nearby, walk eastward on Flournoy and, a few minutes later, heard a single noise she believed to be a gunshot. She then saw a black male wearing a baseball jersey with matching shorts and a baseball cap, running past her; heading west on Flournoy and then south on Francisco. He was about 19 or 20 years old, weighed about 160 pounds, and had a medium complexion. She had seen him before in the neighborhood and, after the shooting, the gunman returned to the scene wearing different clothes. Reed neither identified the man by name, nor did she see the actual shooting.

Detective Eugene Roy testified that on August 29 he and his partner spoke with the victim's mother, who revealed that Porter had a substance abuse problem and normally bought his drugs at the corner of Flournoy and Francisco. Roy and his partner returned to that corner, spoke with area residents, passed out his business cards and asked people to call him if they had any information regarding the homicide. On September 7, Roy received a telephone call from a man who refused to give his name for fear of retaliation, but told him that defendant had committed armed robberies of drug sellers and users near Flournoy and Francisco and that defendant shot the victim during an attempted robbery because the victim refused to comply with defendant's demands. The caller stated that defendant resided at 706 South California. Roy found a police file record of defendant living at 706 South California but could not locate him.

Detective Kato testified. On October 6, while assigned to conduct a follow-up investigation of the Porter homicide, he spoke with an unnamed person on a street near the site of the homicide, who told Kato that defendant had been staying at 3047 West Flournoy since the day of the shooting. That evening, Kato and his partner went to that address with two police officers to find defendant. A woman, defendant's girlfriend, allowed them to enter. Defendant appeared in a hallway toward the back of the apartment and agreed to come to the police station to talk about the homicide.

At the station shortly after 10 p.m., Kato seated defendant in an interview room. Kato left, leaving the door open and without handcuffing defendant. He returned after about five minutes, carrying reports of the homicide investigation. Kato and his partner advised defendant of his *Miranda* rights. Defendant then told the detectives that he was near the scene of the crime at the time of the shooting. After hearing gunshots, defendant ran over to the victim, where he heard people saying that another man, named Jeffrey, attempted to rob the victim and shot him in the process. Defendant gave Kato a physical description of Jeffrey and suggested possible locations where Jeffrey could be found. Kato then left in search of

Jeffrey. He told defendant that he would leave the door to the interview room open but that another officer might shut the door to prevent other investigations from being interrupted. Kato also told defendant that he could go to the bathroom or water fountain.

Kato returned to the station after about an hour, spoke with defendant to obtain more information about Jeffrey, learned the suspect's last name was Williams, and left again to look for him. By now it was 1 a.m. on October 7. Kato brought Juanita Reed to the police station to view a lineup, but she could not identify anyone, including defendant. Kato left again to look for Williams and returned to the police station about an hour later, now 4 a.m. Kato, unable to find Williams, asked defendant if he knew of any other place where Williams could be found. This time defendant responded that Kato did not have to look for Williams anymore, because defendant himself accidentally shot the victim. Kato then arrested defendant.

Police Officer Paul Sarpalius testified that, on October 6, he, his partner, and two detectives went to 3047 West Flournoy to find defendant. Sarpalius and his partner covered the side and rear exits to the house as the two detectives knocked on the front door. Once the detectives were allowed in the home, Sarpalius and his partner went to the front of the home. Sarpalius saw defendant sitting on a couch in the front room, without handcuffs. A detective asked defendant about the shooting and, after defendant responded in the affirmative, the detective asked defendant to come down to the police station to make a statement. Defendant agreed. The officers and detectives returned to the station with defendant. The detectives took defendant to an interview room, later exited the room, leaving the door open, and told Sarpalius they planned to look for a suspect named Jeffrey. Sarpalius allowed defendant to go to the water fountain.

Michael Harris, a second-floor resident at 3047 West Flournoy, testified on rebuttal for defendant that, on October 6 at 10 p.m., a police officer pushed in his front door, told him and a friend to get up and get dressed, took the two men downstairs and placed them in a police car. As he walked downstairs, Harris saw defendant coming out of the first-floor apartment with his girlfriend, Detective Kato, and other police officers. Defendant also was being brought to the police station and was handcuffed. On redirect examination, Harris testified that he saw the handcuffs as defendant left his girlfriend's apartment, but on cross-examination, Harris stated that he saw the handcuffs when defendant got into the police car. Harris stayed at the station for several hours, during which time he was placed in a lineup.

Officer Sarpalius testified a second time to rebut Harris' testi-

mony, whom he recognized from the lineup in which defendant was also present. Sarpalius asserted that he and his partner had picked up Harris and another man on the street, asked them to participate in a lineup, and offered to give them a ride back to their homes or wherever else they wanted to go afterwards. The two men were not handcuffed.

The circuit court denied defendant's motion to quash his arrest, found that based upon the totality of the circumstances, the police had probable cause to believe that defendant was involved in the murder, determined that the State's witnesses were more credible than defendant's, did not believe defendant's testimony that he was sleeping in his bedroom when the police arrived, and noted that both defendant and Harris were convicted felons, defendant having served time for armed robbery and Harris currently serving time for robbery. Harris also had a previous conviction for possession of a controlled substance.

The circuit court next concluded that defendant was not in custody when he went with the officers to the police station and remained there for several hours, until he made the confession and was then arrested.

At the hearing on the motion to suppress defendant's confession, Assistant State's Attorney Domenica Stephenson testified that, on the morning of October 7, 1991, she took defendant's confession concerning Edward Porter's murder. Defendant was not handcuffed and told Stephenson that he had been treated well by the police. Defendant told her the police informed him that a witness identified him in the lineup. She never heard a police officer tell defendant he had been identified in the lineup. Detective Kato also testified that defendant was not handcuffed until he gave Stephenson his statement, and just before he was taken to the lockup.

The circuit court denied defendant's motion to suppress the confession. Defendant and Williams thereafter were tried as codefendants in a bench trial, although the court severed their cases. The Williams appeal has been considered separately in Docket No. 1—95—0311, in an unpublished Supreme Court Rule 23 order. Official Reports Advance Sheet No. 15 (July 20, 1994), R. 23, eff. July 1, 1994.

At trial, Reed testified substantially as she had at the suppression hearings.

Alvin Weems, a Chicago police officer, testified that on August 28, after the police department received a call regarding the shooting, he and his partner went to the scene of the homicide at Flournoy and Francisco and called for an ambulance. Area residents informed

the officers that the victim had gotten out of a nearby car before he was shot. The officers learned that the car was registered to Edward Porter.

Detective Kato also testified. He brought defendant to the police station, where he eventually confessed to killing Edward Porter. Kato read defendant's confession into evidence, which stated that at 1 a.m. on August 28, 1991, defendant watched Porter purchase some cocaine and decided to rob him of that cocaine. He borrowed Jeffrey Williams' .38-caliber gun, walked up to Porter and ordered him to hand over the drugs. Porter refused, and defendant pulled out the gun and pointed it at Porter's chest and stomach. The gun was already cocked, which defendant did not realize, and when his finger touched the trigger, the gun went off. Defendant ran to his girlfriend's house and threw the gun into a garbage can.

Darren Ray testified for defendant. Ray previously had been convicted of three drug-related crimes. On August 28, 1991, he was sitting on the porch of his home, located one block west of the corner of Flournoy and Francisco, when he heard gunshots, did not see the shooting, walked to the scene and saw Porter lying on the ground. As he walked away, he saw defendant coming toward him with a friend named Cory. Defendant asked Ray what happened and walked toward Porter's body. After viewing the body, defendant and Cory walked away.

Defendant testified and denied shooting Porter. At the time of the shooting, defendant was standing outside with some friends a few blocks away from the corner of Flournoy and Francisco. Defendant heard the gunshots, went with a friend named Cory to the scene, saw Porter's body, and returned home.

Defendant asserted that Detective Kato forced him to sign the statement confessing the crime by threatening physical harm. Defendant had heard other people talk about Kato using force to coerce people into signing confessions, and Kato also used force on him, hitting him 12 times. After defendant was placed in the lineup, Kato told defendant he had been identified as the perpetrator. Defendant told Stephenson, the assistant State's Attorney, that he'd been beaten, but she didn't believe him. Defendant then signed the statement.

On cross-examination, defendant acknowledged that he sustained no visible injuries, he was never treated at the jail's hospital for any injuries he might have suffered, and he did not exhibit any scars resulting from the alleged beating.

On rebuttal, Stephenson testified that defendant told her he was treated well by police and never mentioned being threatened or hit

by Kato. Kato also testified in rebuttal that he never struck or threatened defendant.

The State also introduced evidence showing that the victim was admitted to the hospital on August 28 and a discharged bullet recovered from his body was identified as a .38-caliber special. An autopsy concluded that the victim died from a bullet wound that entered his lower chest area.

The circuit court found defendant guilty of felony murder and attempted armed robbery after making extensive findings, based on the evidence, as follows: defendant's confession was accurate and truthful; portions of the statement were corroborated by other uncontroverted evidence in the case, specifically evidence that the victim was shot in the stomach and that the bullet that killed him was a .38 caliber, the same type of gun defendant said he used; defendant was not coerced into signing the statement, noting that the six or seven hours defendant spent at the police station was not significant; defendant actively participated in the preparation of the statement, including several insertions defendant made and initialled, and one such insertion was in regard to the type of gun used; defendant failed to introduce any objective evidence of Kato mistreating him; and Ray's testimony supported the State's case although he testified for defendant, because he placed defendant near the scene of the crime a few minutes after the crime was committed.

Defendant unsuccessfully moved for a new trial. At a presentencing hearing, the circuit court noted that defendant was eligible for the death penalty. The State presented in aggravation defendant's previous armed robbery conviction, and noted that defendant committed the murder for the sole purpose of monetary gain. In mitigation, defendant asserted that he accidentally shot the victim and his actions were not premeditated or intentional. The court observed several other mitigating factors, such as his mother having abandoned him, his young age at the time he committed the crime, and the fact that he took job training classes. The court then sentenced defendant to 60 years in prison on the murder count and 25 years on the attempted armed robbery count. Defendant appeals.

## I

Defendant assigns error in the circuit court's denial of his motions to quash his arrest and suppress his statement because the police did not have probable cause to arrest him and his confession resulted from the illegal arrest.

The parties presented conflicting witness evidence regarding the voluntary nature of defendant's detention at police headquarters.

The circuit court was required to weigh and decide the credibility of the witnesses, and its ruling on a motion to quash an arrest will not be disturbed unless manifestly erroneous. *People v. Redd*, 135 Ill. 2d 252, 268, 553 N.E.2d 316 (1990); *People v. McClellan*, 232 Ill. App. 3d 990, 999, 600 N.E.2d 407 (1992) (*McClellan*).

■ To determine whether a person has been arrested, a court must decide whether, under the circumstances presented, a reasonable person would have believed that he was not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 573, 100 L. Ed. 2d 565, 572, 108 S. Ct. 1975, 1979 (1988); *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980). When detained for custodial interrogation, one is not free to leave, and the detention must be supported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 214, 60 L. Ed. 2d 824, 837, 99 S. Ct. 2248, 2257 (1979); *People v. Sturdivant*, 99 Ill. App. 3d 370, 372, 425 N.E.2d 1046 (1981). Not every interrogation held at a police station, however, is custodial. *People v. Holmes*, 198 Ill. App. 3d 766, 774, 556 N.E.2d 539 (1989); *People v. Davis*, 142 Ill. App. 3d 630, 636, 491 N.E.2d 1285 (1986).

■ To decide whether an accused has been detained, the court must consider several factors, including: (1) the time, place, length, mood and mode of the interrogation; (2) the number of police officers present; (3) whether defendant's friends or family are present; (4) whether the police took steps involved in a formal arrest procedure, such as using physical restraint, making a show of weapons or force, booking or fingerprinting; (5) the extent of the officers' knowledge, their intent, and the focus of their investigation; (6) the manner in which the individual went to the place of interrogation; and (7) whether defendant was told he was free to leave. *People v. Reynolds*, 257 Ill. App. 3d 792, 799, 629 N.E.2d 559 (1994); *People v. Gordon*, 198 Ill. App. 3d 791, 796, 556 N.E.2d 573 (1990). Courts must examine the totality of circumstances to determine whether an arrest has been made. *McClellan*, 232 Ill. App. 3d at 999.

■ Defendant in the case *sub judice* spent a long time in the interview room at the police station. The length of an interrogation alone, however, does not conclusively establish whether defendant was illegally detained at the police station. *People v. Perez*, 225 Ill. App. 3d 54, 65, 587 N.E.2d 501 (1992). Here, defendant's stay at the police station resulted from the hours spent by police looking for another suspect, Jeffrey Williams, suggested by defendant himself at the station. Defendant stayed at the police station, then, not only to answer questions about his personal knowledge of the crime, but to help police by telling them where that possible suspect could be found and, if possible, to identify the man at the station once the officers found him.

Other factors present in this case support the circuit court's conclusion that defendant voluntarily accompanied the officers to the police station. Evidence was adduced that the detectives entered the home of defendant's girlfriend after she consented, the detectives did not handcuff or restrain defendant or exhibit any weapons, and defendant agreed to accompany the detectives to the police station. The foregoing facts are similar to those of *McClellan*, where the circuit court's ruling that defendant was not arrested at his home was found not manifestly erroneous because defendant's grandmother consented to their entering the home, defendant agreed to go to the police station to answer some questions, and defendant was not physically restrained or handcuffed, despite defendant's contentions that the police physically coerced him into signing a confession. *McClellan*, 232 Ill. App. 3d at 995, 1000. Similarly, in this case, the court's ruling that defendant was not in custody when he agreed to go to the police station was not manifestly erroneous.

Cases cited by defendant are distinguishable. In *People v. Avery*, 180 Ill. App. 3d 146, 534 N.E.2d 1296 (1989) (*Avery*), defendant was taken to the police station for questioning without being searched or handcuffed. The police arrest report, however, stated that defendant was arrested at his home. Also, defendant was placed in an interview room alone and separate from two friends who were being questioned, and he was repeatedly confronted by police during the interrogation about inconsistencies in statements made by him and his friends. *Avery*, 180 Ill. App. 3d at 150-51. In *People v. Beamon*, 213 Ill. App. 3d 410, 572 N.E.2d 1011 (1991) (*Beamon*), defendant accompanied officers to the police station after police made a "show of force" by placing several officers outside the home with instructions to arrest anyone who tried to leave the home, arguing with defendant's mother, and rousing defendant from his bed in his bedroom. *Beamon*, 213 Ill. App. 3d at 426.

In the present case, the testimony of the police detectives, which the circuit court found to be credible, reveals that they gave defendant no indication that he was not free to leave. Kato asked defendant if he would come to the police station, located less than one-half mile away, to give them information regarding Porter's homicide. At the police station, defendant gave police the name of a possible suspect, Williams, and stayed at the station in an interview room with the door open while the police looked for the suspect. Unlike *Avery*, the police in this case never indicated that defendant was a suspect and never repeatedly confronted him regarding his personal involvement in the crime. In contrast to *Beamon*, the police here did not make a "show of force" by planning to arrest anyone who tried to leave the home or by arguing with members of defendant's family.

Assuming, *arguendo*, that defendant had been detained at his girlfriend's home, evidence already obtained by police provided them with sufficient probable cause to take defendant into custody. A warrantless arrest may be conducted by police if they have probable cause to believe that the person to be arrested has committed or is committing an offense. 725 ILCS 5/107—2(1)(c) (West 1992); *People v. Smith*, 222 Ill. App. 3d 473, 478, 584 N.E.2d 211 (1991). Probable cause is found "when a reasonable and prudent person in possession of the knowledge of facts and circumstances known to the officer at the time of the arrest would believe that the suspect had committed the offense." *Smith*, 222 Ill. App. 3d at 478. See also *Illinois v. Gates*, 462 U.S. 213, 230-31, 76 L. Ed. 2d 527, 534, 103 S. Ct. 2317, 2328 (1983). Although mere suspicion by the officer is not enough to justify a warrantless arrest, neither is evidence sufficient to convict required. *Smith*, 222 Ill. App. 3d at 478. In addition, probable cause may be founded upon evidence that would not be admissible at trial. *People v. Hoover*, 250 Ill. App. 3d 338, 348, 620 N.E.2d 1152 (1993).

Before contacting defendant here, the State possessed two key pieces of evidence: Reed's depiction of a man running past her shortly after the shooting and an anonymous phone call implicating defendant and offering details of the crime. The State concedes that Reed's portrayal alone may not establish probable cause, because her description of the man as being 19 or 20 years old, of medium height, medium weight, and medium complexion, not only fit defendant, but also could match the description of many other men. Considering all the facts and circumstances, however, Reed's description, taken together with details provided by the anonymous tip previously set forth, provided police with enough evidence to establish probable cause.

In cases where probable cause is based on information obtained by an informant, factors such as the veracity and reliability of the information, as well as the informant's basis of knowledge, must be examined. *Gates*, 462 U.S. at 231, 76 L. Ed. 2d at 534, 105 S. Ct. at 2328; *People v. Adams*, 131 Ill. 2d 387, 398, 546 N.E.2d 561 (1989). If the informant is unknown, an independent showing of reliability is required because of the obvious risk of misrepresentation or outright fabrication. *People v. James*, 118 Ill. 2d 214, 223, 514 N.E.2d 998 (1987).

In the case *sub judice*, the police independently corroborated several details given them by the anonymous caller. The caller told a detective that after the victim purchased some drugs, defendant attempted to rob him at gunpoint, and defendant shot the victim when he refused to comply with defendant's demands. The caller further

stated that defendant lived at 706 South California. The police had already learned from the victim's mother that the victim had a substance abuse problem and that, when he purchased drugs, he went to the corner of Flournoy and Francisco, the exact location where he was killed. The police also identified defendant's name in their files and found that he resided at 706 South California. The information obtained independently by police confirmed information given them by the caller and established the overall reliability of the caller's tip. The police therefore had probable cause to arrest defendant. Because defendant's confession did not result from an illegal arrest, the circuit court properly denied defendant's motion for its suppression.

■ Defendant also contends that, before he confessed, the police lied to him by telling him he was identified in a lineup, although the witness who viewed the lineup, Reed, identified no one. One of the State's witnesses, Stephenson, testified that although defendant told her police informed him that he was identified in the lineup, she heard no officers so inform him. Defendant did not question Stephenson about this testimony on cross-examination and introduced no other evidence in this regard. The circuit court, as the trier of fact, was in the best position to decide the weight and credibility to be given this testimony.

Considering all the evidence, the court's denial of the motion to suppress the confession was not manifestly erroneous.

## II

Defendant next disputes the circuit court's finding that defendant was guilty of attempted armed robbery and felony murder, asserting that evidence presented at trial was insufficient to corroborate his confession with regard to the attempted armed robbery charge and, in fact, there was no evidence to show that the offense of attempted armed robbery occurred. Although we direct the circuit court to vacate defendant's conviction and sentence for the attempted armed robbery charge under Point III of this opinion because it is a lesser included offense of felony murder, defendant's contention that this charge lacked evidentiary support must be considered since it impinged upon the court's sentencing, as noted in Point IV of this opinion.

■ A conviction based on a confession will be upheld where evidence corroborating the confession is produced. Corroboration may be satisfied by proof of the *corpus delicti. People v. Willingham,* 89 Ill. 2d 352, 359, 432 N.E.2d 861 (1982). To prove the *corpus delicti,* the State must prove both injury or loss and criminal agency. *People v.*

*Dalton*, 91 Ill. 2d 22, 29, 434 N.E.2d 1127 (1982). Some independent or corroborating evidence outside of the confession, that tends to establish that a crime occurred, must be shown (*People v. Lambert*, 104 Ill. 2d 375, 378-79, 472 N.E.2d 427 (1984); *Willingham*, 89 Ill. 2d at 359), but does not have to establish independently the offense beyond a reasonable doubt. *People v. Howard*, 147 Ill. 2d 103, 128, 588 N.E.2d 1044 (1991) (*Howard*).

In *Howard*, defendant confessed to murdering the victim and, in a signed written statement, he admitted borrowing a gun from a friend in order to rob someone, approaching a parked car containing two people whom he planned to rob, and asking the driver for a cigarette and a light. When the driver reached into his pocket, defendant thought he was reaching for a gun and shot him. 147 Ill. 2d at 120. The other, unharmed occupant in the car identified defendant as the shooter and testified at trial that defendant walked up to their car and shot the driver when the driver refused to give him a match. 147 Ill. 2d at 118. This witness's testimony, along with other physical evidence, was found to have corroborated defendant's confession sufficiently, and established the *corpus delicti* of the attempted armed robbery charge. 147 Ill. 2d at 127.

In *People v. Montes*, 192 Ill. App. 3d 874, 876, 549 N.E.2d 700 (1989) (*Montes*), the victim was shot at close range at 1 a.m. on a city sidewalk. Defendant there confessed to serving as a lookout as another man attempted to rob the victim and then shot him. Other witnesses testified at trial that they either saw or heard the shooting. 192 Ill. App. 3d at 880. The court held that the evidence independent of the confession sufficiently corroborated defendant's confession of attempted armed robbery, acknowledging that the other testimony did not establish an attempted armed robbery, but reasoning that evidence of a man having been shot to death at one o'clock in the morning, with the shooter fleeing, tended to establish the crime of attempted armed robbery. 192 Ill. App. 3d at 881.

In both *Howard* and *Montes*, the courts held that the State established the *corpus delicti* for attempted armed robbery when each defendant confessed to the crimes of both robbery and murder, although the independent evidence directly corroborated only the portions of the confession relating to the murder charge. Their holdings are consistent with the purpose for requiring independent evidence that corroborates defendant's confession, which is to ensure that the confession itself is reliable. Requiring the introduction of evidence that corroborates a confession guards against the possibility that defendant was coerced into signing a false confession or that for some reason defendant confessed to a crime that he did not commit. *Dalton*, 91 Ill. 2d at 29.

In *People v. Wright*, 286 Ill. App. 3d 456 (1996), cited by defendant, the defendant's conviction for first-degree murder was upheld, but his conviction for attempted armed robbery was reversed because the only evidence at trial tending to prove defendant's attempt to commit armed robbery came from defendant's own confession. The facts previously set forth in the present case, gleaned from circumstances outside the confession, satisfy the requirement of *Howard*, in that evidence independent of the confession tended to show the commission of attempted armed robbery and corroborated defendant's confession in this regard.

Defendant cites three other cases in support of his argument, each distinguishable, of which two do not even address the *corpus delicti* issue. *People v. Land*, 169 Ill. App. 3d 342, 377 N.E.2d 824 (1988); *People v. Falkner*, 61 Ill. App. 3d 84, 377 N.E.2d 824 (1978). In *People v. Kokoraleis*, 149 Ill. App. 3d 1000, 1031, 501 N.E.2d 207 (1986), defendant was convicted of rape and murder. The court held that the State failed to introduce enough evidence to corroborate defendant's confession to the rape charge, making it distinguishable from the present case. There, the State introduced no evidence that tended to establish the crime of rape, casting doubt on the reliability of defendant's confession.

As it did in *Wright*, the State proposes here that this court dispense with the *corpus delicti* rule. In *People v. Furby*, 138 Ill. 2d 434, 563 N.E.2d 421 (1990), the supreme court noted that the value of the rule has been questioned but refused to address the issue because the State did not raise it. We must await a supreme court ruling in this regard.

There was sufficient evidence tending to corroborate defendant's confession as to the attempted armed robbery charge and the circuit court did not err in so finding.

### III

■ Defendant asserts that his conviction and sentence for attempted armed robbery must be vacated because it is a lesser included offense of the crime of felony murder. The State concedes that the circuit court erroneously convicted and sentenced defendant on the attempted armed robbery count and does not oppose defendant's request to vacate his conviction and sentence for that offense. We agree and that conviction and sentence must be vacated. *People v. Washington*, 272 Ill. App. 3d 913, 919-20, 651 N.E.2d 625 (1995); *People v. Cardona*, 240 Ill. App. 3d 110, 126, 608 N.E.2d 81 (1992).

### IV

■ Defendant lastly contends the circuit court erred in exces-

sively sentencing him to 60 years for the felony murder conviction, because the shooting was accidental and the attempted armed robbery offense was improperly considered as an aggravating factor.

When contemplating a sentence, a circuit court must consider the rehabilitation of defendant and the seriousness of the offense. *People v. Young*, 124 Ill. 2d 147, 156, 529 N.E.2d 497 (1988). Sentencing is a matter within the circuit court's discretion and that determination will not be overturned absent abuse. *People v. Caballero*, 237 Ill. App. 3d 797, 810, 604 N.E.2d 1028 (1992). A circuit court is presumed to know the law and apply it properly, and its decision regarding sentencing is entitled to great deference and weight; defendant therefore must show affirmative error. *People v. Askew*, 273 Ill. App. 3d 798, 805, 652 N.E.2d 1041 (1995).

Defendant proposes that the circuit court erroneously believed that defendant was eligible for the death penalty, which it took into consideration in deciding the appropriate sentence. He contends that he was not eligible for the death penalty because the shooting was accidental, and the death penalty statute requires that defendant intended to kill the victim. The statute cited by defendant has been amended, however, and no longer requires that, under all circumstances, defendant intended to kill the victim when he committed the felony.

The previous death penalty statute provided that a defendant could be sentenced to death if the murder occurred in the course of another felony, the victim "was actually killed by the defendant *** and (b) the defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm." Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6). A defendant was not eligible for the death penalty under this provision unless, while committing a felony, he intentionally killed the victim. *People v. Mack*, 167 Ill. 2d 525, 533, 658 N.E.2d 437 (1995).

The amended version of this statute eliminates the requirement of a mental state. The statute now provides that a defendant who is convicted of felony murder is eligible for the death penalty if "(a) the murdered individual: (i) was actually killed by the defendant, or (ii) received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by one or more persons." 720 ILCS 5/9—1(b)(6)(a)(i), (b)(6)(a)(ii) (West 1992) (amended by Pub. Act 82—1025, § 1, eff. December 15, 1982). The requirement that defendant acted with the intent to kill applies only to circumstances occurring under subparagraph (a)(ii). 720 ILCS 5/9—1(b)(6)(b) (West 1992).

In this case, subparagraph (a)(i) applies, in that defendant actually killed the victim when he attempted to commit a felony. The mental state requirement does not apply to these circumstances, and defendant's lack of intent to kill did not preclude him from being eligible for the death penalty. The circuit court did not abuse its discretion in considering this factor.

The record shows that the circuit court properly considered several mitigating factors, including defendant's young age at the time he committed the crime, his mother abandoning him at a young age, and his efforts to join a job training program. As stated above, the State proved defendant guilty of attempted armed robbery beyond a reasonable doubt, which the court could consider as an aggravating factor when issuing the sentence. Defendant's rehabilitative prospects, his youth, the nature of the crime, protection of the public, deterrence, and punishment are all relevant factors to consider during sentencing. *People v. Whitehead*, 171 Ill. App. 3d 900, 908, 525 N.E.2d 1084 (1988). After considering these factors, the court chose not to sentence defendant to death and, instead, sentenced him to 60 years in prison. Defendant has failed to show that the court committed any errors during sentencing. His sentence of 60 years' imprisonment therefore must be upheld.

For the foregoing reasons, defendant's conviction for first-degree murder, based upon his commission of an underlying felony, attempted armed robbery, must be affirmed. Because his conviction for attempted armed robbery is a lesser included offense, that conviction and the subsequent sentence must be vacated and this cause remanded to the circuit court for that purpose.

Affirmed in part, vacated in part and remanded with directions.

HOURIHANE and SOUTH, JJ., concur.